1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WALTER JOSEPH COOK, III,

        Plaintiff,

  v.

SCOTT KERNAN, *et al.*,

        Defendants.

No. C 15-06343 WHA

**ORDER RE
SECTION 2254 PETITION**

**INTRODUCTION**

Petitioner, who was convicted on three counts of murder in 1994, filed a petition for a writ of habeas corpus under 28 U.S.C. 2254. For the reasons discussed below, his petition is **DENIED**.

**STATEMENT**

In June 1994, a jury in San Mateo County Superior Court found petitioner Walter Joseph Cook, III, guilty of three counts of first-degree murder, personal use of a dangerous weapon, personal use of a firearm, personal use of great bodily injury, and a multiple-murder special circumstance. The following month, the jury returned a verdict of death.

In August 2006, the California Supreme Court affirmed Cook's conviction and sentence in full. The following recitation of the factual background of this case is excerpted from the decision of the Supreme Court of California affirming Cook's conviction on direct appeal. All factual determinations are presumed correct pursuant to Section 2254(e)(1), rebuttable only

by clear and convincing evidence. *See also Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

## I.   FACTS AND PROCEEDINGS.

### A.   Prosecution's Guilt Phase Case–in–Chief.

The murders of Ernest Sadler, Michael Bettancourt and Ronald Morris occurred on separate occasions and were unrelated to one another, except for each victim's link to defendant, a seller of crack cocaine.

#### 1.   Sadler Murder.

Around 4:00 o'clock on the morning of February 9, 1992, police officers found the body of Ernest Sadler lying on the pavement in the 2200 block of Menalto Avenue, East Palo Alto. Sadler's head was severely battered and three bloodstained, broken pieces of board were found near his body by officers responding to a 911 call. Because Sadler's distinctive shoe prints were visible on the damp soil in the front yard of the house at 2250 Menalto, San Mateo County Sheriff's Detective William Osborn interviewed the 11 occupants of the residence, none of whom admitted to having seen Sadler killed.

Only months later did several occupants of the house admit that they had known about Sadler's killing. In June, Shawnte Early gave police a recorded statement in which she reported seeing [Cook] fighting with Sadler and continuing to attack Sadler with a stick after Sadler was on the ground. She described coaxing [Cook] into her car and driving him around the corner only to have him jump out and run back to resume beating Sadler. At trial, Early repudiated her taped interview, testifying that she did not remember having made the detailed statement, and that it was untrue. A tape recording of her June 1992 interview was played for the jury.

Ernest Woodard, who lived at 2250 Menalto, testified that he was awakened that night by "someone" who told him there was a fight outside. He saw [Cook], whom he knew by sight, engaged in a fist fight, and told the combatants to move on down the street. Woodard, a convicted felon, feared a police investigation of the fight would bring them to his house. At the time of trial, Woodard was serving a prison term for selling cocaine.

Some time after the fight, Velisha Sorooshian, a relative by marriage of Woodard's, came to 2250 Menalto with Leonard Holt to buy crack cocaine. While the pair sat in their car smoking a pipe of crack cocaine, a car containing [Cook] pulled alongside, and he laughingly asked Velisha to go see if the man lying in the street was all right. She assumed [Cook] was joking until she returned to 2250 Menalto to buy more cocaine and Woodard told her the man was probably dead; Woodard asked her to call 911, which she did. Holt testified that earlier in the evening, about 8:00 or 9:00 o'clock, he had run into Sadler. When Sadler said he

2

wanted to buy a $5 dollar rock of cocaine, Holt told him to try the Woodard house.

The day after Sadler's death, Shannon Senegal, [Cook]'s cousin, ran into [Cook], who reported that he had "beat someone down last night" on Menalto, identifying his victim as Sadler. [Cook] explained that Sadler had taken some of [his] crack and tried to run off with it. When Senegal asked if Sadler had died, [Cook] said he did not know and expressed no concern over that possibility. (At the time of trial, Senegal was in custody, charged with being an accessory after the fact to the murder of Ronald Morris.)

According to the pathology report, Sadler's death was the result of having aspirated blood into his lungs from extensive injuries to his face and head, including ruptured eyeballs and broken facial bones. These injuries were consistent with a severe beating. Sadler had a blood-alcohol level of .09 percent and tested positive for both cocaine and cocaine metabolite. Sadler was 44 at the time of his death.

### 2. *Bettancourt Murder.*

Between midnight and 1:00 a.m. on February 14, 1992, a group of people was gathered in East Palo Alto on Alberni Street, a site of illegal drug sales. A group of young women, including Shawnte Early, Teresa Beasley, and Tomika Asburry, was in the street drinking to celebrate the birthday of their friend Valerie Gardley. When a gold Thunderbird car stopped in the middle of the street, its driver, Michael Bettancourt, who was apparently trying to buy drugs, was immediately surrounded by potential sellers, including [Cook]. Steven Sims, one of the sellers, stuck his arm in through the open driver's window but was jostled, causing him to drop his rock of cocaine inside Bettancourt's car. Sims opened the driver's door to look for the fallen rock. Sims then heard [Cook], who was holding a 9-millimeter automatic pistol, threaten Bettancourt to return the rock or pay for it. When [Cook] yelled, "Get back, get back," Sims stepped away and saw [Cook] shoot Bettancourt once in the leg, then pause and unload the "clip in the nine," shooting Bettancourt repeatedly. Although Asburry identified [Cook] as the shooter in her statement to the police, at trial she recanted, insisting that she had not seen the shooter, and that her earlier statement was false.

After the shooting, Nathan Gardner testified that [Cook] jumped into Gardner's car, rode a few blocks, and got out. During the ride, when Gardner asked why he had shot Bettancourt, [Cook] explained that Bettancourt had tried to "gaffle," meaning to steal from, him. Steven Sims testified that a day or so after the shooting he encountered [Cook] on the street and referring to the shooting said, "Dude you tripped out." [Cook] replied, "He should have give[n] me my money or my rock back."

Bettancourt was found dead in his car, with the driver's door standing open. No one in the neighborhood contacted by the responding officer had any information to impart about the shooting. That officer saw numerous shell casings in the street

next to the open car door; investigators recovered 13 cartridge cases and two bullets from that area. Later forensic examination determined that 11 of the shell casings had come from a single gun.

### 3. Morris Murder.

On the afternoon of May 21, 1992, three women accompanied Sharoon Reed to University Liquors. As the women left the liquor store in their car, they encountered Shannon Senegal, who was driving a tan-topped, burgundy-colored Nova car; Lavert Branner and [Cook] were passengers. The men in the Nova were in a hurry to pull out of the parking lot, and one of them shouted at the women to "hurry up and move." [Cook] displayed a gun to the women, who slowed their car, but followed the Nova at a distance. The women were headed for a birthday party in honor of Ronald Morris. Morris, who knew and was friendly with Senegal, had just parked his car on East O'Keefe Street where the party was to be held when he hailed the Nova, which made a U-turn and pulled next to him.

Senegal testified that while he was talking with Morris, [Cook], who was in the front passenger seat, suddenly leaned across Senegal and started shooting Morris, announcing, "I told you I will get your punk ass back." According to Senegal, [Cook] harbored a grudge against Morris for an incident about a week earlier when an armed Morris had encountered [Cook], who was unarmed, and had mocked [Cook]'s vulnerability. [Cook] told Senegal he would "get back" at Morris.

Reed testified that, from the women's car, she overheard Morris as he looked into the Nova from the driver's side say, "Damn, you all strapped," indicating that the Nova's occupants were armed. By Reed's account of the shooting, Morris suddenly turned away from the Nova just before she heard multiple shots fired.

Dr. Parviz Pakdaman, a pathologist, testified that Morris had five bullet wounds in his heart and lungs, any one of which was "potentially fatal." The victim's blood tested negative for drugs but showed a .04 percent level of alcohol.

### 4. Murder Weapon.

Various 9-millimeter cartridge casings recovered from the pavement where Morris fell were compared to 9-millimeter casings recovered from the Bettancourt murder, but San Mateo County Sheriff's criminalist Nick Stumbaugh could not determine with certainty whether both sets of casings had come from the same weapon, possibly because those from the earlier killing were aluminum while those from the later killing were brass.

[Cook] was arrested on a California warrant in Oklahoma on June 26, 1992; he waived extradition, and he was returned to California to stand trial. While still in Oklahoma he gave a lengthy interview to East Palo Alto Police Sergeant Gregory Eatmon and Inspector Bruce Sabin of the San Mateo District Attorney's Office. In that interview, [Cook] said he "blanked out" and could not remember

4

killing Morris, but he admitted that after an evening of drinking he had used his 9-millimeter handgun to shoot Bettancourt and that on the day after the Morris shooting he had thrown the gun off the Dumbarton Bridge. No gun was ever recovered.

**B.     Defense Case at the Guilt Phase**.

Conceding that [Cook] had shot Bettancourt, the defense focused on the similarity of the witnesses' statements as evidence they had been coached by the police. Teresa Beasley, who had given a statement in June 1992 identifying defendant as the shooter of Bettancourt, testified that her statement had been coerced and reflected what the police wanted her to say.

The defense further sought to establish that Bettancourt's killing was at most second degree murder. Accordingly, it presented expert testimony by Kenneth Mark, a private criminalist; in Mark's opinion, a 170-pound person who consumed two 40-ounce beers and a pint and a half to two pints of alcohol over 10 hours without eating would be at best unsteady on his feet and at worst unconscious. Dr. James Missett, a psychiatrist with expertise in the effects of alcohol and drugs, testified that a person angry when drinking would "interpret things in an angry way."

With respect to the killings of Morris and Sadler, the defense portrayed the police investigation as an effort to frame defendant with those unsolved murders by persuading or pressuring witnesses to inculpate defendant, instead of Shannon Senegal, Lavert Branner, or some unknown party. Seeking to cast doubt on defendant's culpability for Morris's death, the defense presented evidence that linked Shannon Senegal and Lavert Branner to the killing. It relied on a May 1992 statement by Tasha Bradford identifying Shannon Senegal, the driver of the Nova, as the man who shot Morris, and identifying his passenger as Walter Wright or Walter White, not defendant Walter Cook. It also presented the testimony of Shannon Senegal's sisters that their brother and [Cook] were together on the day of Morris's shooting, that Shannon flew to San Diego shortly after the shooting, and that one sister had attempted to mislead both a defense investigator and the police about Shannon's whereabouts.

Monique Barrett and Lakishain Smith testified that on May 9, 1993, Lavert Branner told them he had shot Morris. Barrett had become friendly with defendant, who was her husband's cellmate. Smith first met [Cook] when he was in jail, and she then began visiting and corresponding with him.

The defense sought to show that Branner also knew murder victim Morris well, having roomed with him at the California Youth Authority. It emphasized that Branner had repeatedly been assured by police that he was not a suspect in the Morris murder. On the eve of trial, Branner conformed his version of events to Senegal's account that it was Senegal, not [Cook], in the driver's seat when Morris was shot.

5

> As for the Sadler killing, the defense emphasized that the police
> long lacked a suspect in that killing, in part because many of the
> probable witnesses at 2250 Menalto on the night of the killing
> were Woodard family members, relatives, or associates, who were
> apparently reluctant to talk lest they implicate other family
> members in the case.

*People v. Cook*, 39 Cal. 4th 566, 574–81 (2006) (errors in original) (footnote omitted).

While Cook's direct appeal remained pending, he filed a state habeas petition, which was

assigned case number S136687 at the California Supreme Court. In December 2010, the

California Supreme Court issued an order to show cause returnable in San Mateo Superior Court

why Cook's death penalty should not be overturned on the grounds that he was mentally retarded

pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). An order from San Mateo Superior Court

vacated Cook's death sentence, and imposed a sentence of life without the possibility of parole.

The California Supreme Court summarily denied the balance of Cook's habeas petition

on the merits with the same order. The full order of the California Supreme Court, is excerpted

below (*see* Exh. C6):

> The Director of the Department of Corrections and Rehabilitation
> is ordered to show cause in the San Mateo County Superior Court,
> when the matter is placed on calendar, why petitioner's death
> sentence should not be vacated and petitioner sentenced to life
> without possibility of parole on the ground that he is mentally
> retarded within the meaning of Atkins v. Virginia (2002) 536 U.S.
> 304, as alleged in Claim Eight of the petition for writ of habeas
> corpus filed August 24, 2005. (See In re Hawthorne (2005) 35
> Cal. 4th 40.) The return is to be filed on or before January 14,
> 2011. All of the remaining claims in the petition are denied on the
> merits. In addition, Claims Seven and Twelve are procedurally
> barred because they could have been, but were not, raised on
> appeal. (In re Dixon (1953) 41 Cal. 2d 756, 759.) Petitioner's
> allegations in Claim One that the prosecutor committed acts of
> misconduct at trial (petn., ¶. 97–115) are procedurally barred
> because most of the alleged acts of misconduct were not
> challenged on appeal (Dixon, supra, at p. 759), and the remaining
> acts were raised and rejected on appeal (In re Waltreus (1965) 62
> Cal. 2d 218, 225). Petitioner's allegations in Claim One that the
> prosecution engaged in discovery violations (petn., ¶. 115-119) are
> barred with respect to witnesses Lane, Harrison, Sorooshian, and
> Young because the allegations were raised and rejected on direct
> appeal (Waltreus, supra, at p. 225) and in all other respects are
> barred because they could have been, but were not, raised on
> appeal (Dixon, supra, at p. 759). Petitioner's allegation in Claim
> Two that his statements to the police were obtained in violation of
> his constitutional rights, his allegation in Claim Eleven that he was
> denied his right to a tried by a jury drawn from a representative
> cross-section of the community, and his allegation in Claim Fifteen

that the prosecution used race, gender, and other unconstitutional considerations in its decision to charge, seek, and impose the death penalty are barred on the ground that he could have, but did not, raise these issues at trial. (In re Seaton (2004) 34 Cal. 4th 193.) Justice Werdegar would not apply this procedural bar. (votes: George, C.J., Kennard, Baxter, Werdegar, Chin, Moreno and Corrigan, JJ.)

Cook, who is represented by counsel, filed the instant habeas petition in December 2014. In July 2016, he obtained new counsel, who are representing him pro bono. Cook then moved to strike respondent's answer for failing to specifically admit or deny his factual contentions. In the alternative, he sought an extension of sixty days to file a traverse. Respondent's answer included a general denial, but it also incorporated-by-reference the accompanying sixty-seven page memorandum of points and authority that addressed each of the claims in the petition. After a hearing on the motion, respondent provided a supplemental response addressing whether petitioner's mental disabilities impacted the validity of his *Miranda* waiver — an issue central to several claims. An order then denied Cook's motion to strike, but granted his request for a sixty-day extension for his traverse.

Cook timely filed his traverse in December 2016, and in January 2017, he requested an evidentiary hearing, contending he was entitled to present evidence before a determination of the merits of his habeas petition. This order follows full briefing on the petition and the motion for an evidentiary hearing.

## ANALYSIS

### 1. STANDARD OF REVIEW.

Cook filed his federal habeas petition after 1996 (specifically, in 2015), and therefore, the Antiterrorism and Effective Death Penalty Act of 1996 applies to his claims. 28 U.S.C. 2254; *see Woodford v. Garceau*, 538 U.S. 202, 210 (2003). In order to prevail, Cook must show that the state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d)(2).

This standard mandates substantial deference to the state court's findings of both law and fact. It is not enough that a district court believes the state court's findings were merely wrong, rather, they must be objectively unreasonable to grant relief. *Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.2004) (citations and quotations omitted). For a factual finding to be unreasonable, the district court must conclude that "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor*, 366 F.3d at 1000.

### A. Evidentiary Hearing.

Cook also seeks an evidentiary hearing. "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate*." Schriro v. Landrigan,* 550 U.S. 465, 474 (2007). An evidentiary hearing is not required on issues that can be resolved by reference to the state court record. *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011); *see also West v. Ryan*, 693 F.3d 1140 (9th Cir. 2012) (If petitioner's factual allegations would not entitle him to relief under AEDPA's deferential standards, no evidentiary hearing should be granted). If an issue cannot be resolved based on the record before the district court, however, an evidentiary hearing is appropriate if "(1) [the petitioner] has alleged facts that, if proven, would entitle him to habeas relief, and (2) he did not receive a full and fair opportunity to develop those facts" below. *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005).

Here, Cook has not shown a need for an evidentiary hearing. All issues presented by his petition can be resolved on the record, which includes transcripts, exhibits, and declarations from the trial, appeal to the California Supreme Court, and habeas petition to the California Supreme Court. This record spans literally tens of thousands of pages and adequately covers all issues raised in Cook's petition. Most of the issues raised, were in fact fully before the trial court and resolved by the jury (for example, inconsistencies between witnesses' taped statements and live testimony). Other allegations would not entitle Cook to relief even if proven true, as set forth below.

Accordingly, this order now turns to Cook's petition, first addressing the procedural bar that respondent contends applies, and next addressing the merits of his claims.

### 2.   *DIXON* BAR.

Where a state prisoner has defaulted his federal habeas claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review is barred absent a showing of cause and actual prejudice. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A state procedural bar is independent unless it appears to rest primarily on federal law or it is interwoven with federal law. *Id.* at 733–34. It is adequate if it is "firmly established and regularly followed" as of the time of the state petition to which it applies. *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

Here, the procedural bar at issue — a so-called *Dixon* bar — was (and remains) well-established. The rule is that defendants may not raise arguments for the first time in a habeas petition if those arguments could have been raised on appeal. *In re Dixon*, 41 Cal. 2d 756, 759 (1953). In other words, a habeas petition "cannot serve as a substitute for an appeal." *Ibid.*

Respondent contends that Cook's first claim (for prosecutorial misconduct) and seventh claims (for failing to create, preserve, and settle a complete, accurate, and reliable record) are procedurally defaulted pursuant to *Dixon*, which the California Supreme Court cited as the basis for dismissing some aspects of Cook's state petition. Therefore, respondent argues, absent a showing of cause and prejudice, these claims are barred.

The California Supreme Court, however, did not find the *entirety* of Cook's first claim barred by *Dixon*; rather, it stated that "most of the alleged acts of misconduct were not challenged on appeal" (citing *Dixon*), and that "the remaining acts were raised and rejected on appeal" (citing a separate decision that would not have barred these claims). The California Supreme Court did not specify *which* acts of misconduct had not been challenged on appeal, nor does the record clarify this point. "[U]nless the state court makes clear that it is resting its decision denying relief on an independent and adequate state ground . . . the petitioner may seek

relief in federal court." *Siripongs v. Calderon*, 35 F.3d 1308, 1317 (9th Cir. 1994). Accordingly, claim one is not procedurally barred.

Claim seven (state habeas claim 12), on the other hand, was not raised on appeal, and is therefore barred by *Dixon*. Accordingly, absent a showing of cause and prejudice or actual innocence, claim seven must be denied.

Petitioner argues that claim seven overcomes the procedural bar because it alleges that failure to challenge the deficiencies enumerated in that claim amounted to ineffective assistance of counsel (Traverse at 9). Since ineffective assistance of counsel claims are more appropriately reserved for habeas proceedings, they are not barred for failure to raise them on direct appeal. *See United States v. Anderson*, 850 F.2d 563, 565 n.1 (9th Cir. 1988),

To the extent that petitioner claims appellate counsel was constitutionally ineffective for failing to raise the allegations in claim seven on direct appeal, which are otherwise procedurally barred, he must show first that counsel's failure to raise these claims fell below an objective standard of reasonableness, and second that defendant was actually prejudiced by counsel's failure to make these arguments on direct appeal. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Appellate counsel need not raise every non-frivolous argument, and indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997).

The cause and prejudice standard required to defeat a procedural bar mirrors the standard for ineffective assistance of counsel, and accordingly both can be evaluated under a single framework.

### A.     Cause.

To satisfy the first prong of the *Strickland* test, petitioner must show that counsel's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. There is a "strong presumption" that counsel's representation falls within this range. Here, the alleged error in claim seven is failure to object to the state court's failure to create, preserve, and settle a complete, accurate, and reliable record.

The crux of claim seven is that certain portions of the trial proceedings were conducted off the record, and that court reporters did not transcribe the contents of video and audio tape played in court (Pet. at 181–185). Cook has failed to show how these alleged deficiencies harmed him in any way, or why his defense counsel should have raised these alleged deficiencies on appeal.

With respect to alleged off-the-record proceedings, Cook argues that certain disputes conducted at sidebar or in chambers led to "biased rulings on defense motions" (Pet. at 184). He gives only one example of an allegedly biased ruling, and it does not support a claim of ineffective assistance of counsel. Cook alleges that the trial judge ruled against defense counsel's off-the-record request for funds to have tape-recorded statements of witness Lavert Branner transcribed to assist them in cross-examination. The judge's ruling, even if erroneous, was not so prejudicial as to possibly warrant reversal. Defense counsel had access to the taped statements, and were able to cross examine Branner using those tapes, or notes that they took from the tapes. It was reasonable for appellate counsel not to raise this collateral issue, and to instead focus on matters of more significance to Cook's trial. Absent some actual showing of bias, the mere fact that certain disputes occurred off-the-record is inadequate to support a claim for ineffective assistance of appellate counsel. Therefore, his appellate counsel was not deficient for failing to raise this issue.

With respect to the failure of court reporters to transcribe video and audio-taped statements (the usual practice), Cook claims that the transcripts provided to appellate counsel, which were produced by the San Mateo County District Attorney, were misleading, inaccurate, and unreliable (*id.* at 182). He does not, however, elaborate on this allegation though he has had access to both the recordings and the transcripts. It is undisputed that the jury heard the actual recordings at issue, and that the trial court admonished the jury that the evidence they were to rely upon were the tapes themselves, and not transcriptions. Moreover, his appellate counsel did not need to consult a court reporter's record as they had access to the tapes, and could have as easily listened to or watched the recordings. In short, Cook has failed to show that the "failure" of the court reporter to transcribe certain recorded statements caused him harm, and, in turn that

his appellate attorney's failure to raise these alleged errors fell outside the wide range of professionally competent assistance.[1]

Because Cook has not shown that his appellate counsel's failure to object to the incompleteness of the record amounted to ineffective assistance of counsel, this order does not reach the prejudice prong.

### 3. THE MERITS.

As stated, we evaluate the petition for whether the state court's denial of Cook's petition resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. Where, as here, the state court summarily denied the petition on the merits, the district court "must determine what argument or theories . . . could have supported the state court's decision, and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the United States Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

Cook is "not entitled to habeas relief based on trial error unless [he] can establish that [the error] resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In evaluating whether relief is warranted with regard to a claim, however, our court of appeals has noted that "prejudice may result from the cumulative impact of multiple deficiencies." *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir.1978) (en banc), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979)).

### A. Reliance on Cook's Statements: *Miranda* Violation.

Cook claims that the state improperly relied on statements he made during custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. Cook asserts that he did not knowingly and intelligently waive his rights, and therefore the fruits

---

[1] Even assuming that a failure to fully transcribe recording played in court resulted in a technical violation of post-conviction process, this is insufficient to state a cognizable claim. *See Cooper v. Neven*, 641 F.3d 322, 331-32 (9th Cir. 2011).

of the interrogation should have been suppressed.  He further argues that the interrogation methods coupled with his mental disabilities overbore his free will and resulted in an involuntary confession (Petn. at 92–112).

*Miranda* requires that a person subjected to custodial interrogation be advised that "he has the right to consult with a lawyer and to have the lawyer with him *during interrogation*." *Miranda*, 384 U.S. at 471 (emphasis added).  This warning is given in order to protect a suspect's Fifth Amendment right against self-incrimination, and must precede any custodial interrogation.  *Ibid.*  To establish that a suspect waived his right, the government must introduce sufficient evidence showing that under the totality of the circumstances, the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government's burden to make such a showing "is great," and the court will "indulge every reasonable presumption against waiver of fundamental constitutional rights." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir.1984) (citing *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938)).

The validity of the waiver will depend upon the totality of the circumstances surrounding the interrogation, including . . . the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011).   A defendant's mental capacity directly bears upon the question whether he understood the meaning of his Miranda warning and the significance of waiving his constitutional rights. *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998).  If a waiver is determined to be invalid, habeas relief is appropriate where it "'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Jackson*, 364 F.3d at 1010 (quoting *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)).

Similarly, a coerced confession is inadmissible and violates a defendant's right against self-incrimination. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  While police must apply some force in order to violate due process, the amount varies depending upon the suggestibility of the suspect being interviewed. *Id.* at 163; *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960).  Less force is required to overcome the free will of a highly vulnerable suspect, and thus

1   extract an involuntary confession.  The reduced mental capacity of a suspect renders him more

2   susceptible to subtle forms of coercion.  *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir.

3   2014).

4          This order now turns to Cook's interrogation, first considering whether he was advised

5   of, and knowingly and intelligently waived his *Miranda* rights, and next considering whether the

6   tactics employed during interrogation were such that they overbore Cook's free will.

7          ***(1)      No Knowing and Intelligent Waiver.***

8          ***(a)      Cook's Interrogations***.

9          At the time of Cook's arrest and interrogation, he was eighteen.  He was apprehended by

10  SWAT team members of the police department in his mother's home in Oklahoma, brought to a

11  local jail, and interrogated for approximately six hours beginning just after 7:00 p.m. and

12  continuing until approximately 2:30 a.m., with a break in the middle (Exh. 340; 453).  When

13  given *Miranda* warnings, including the warning that he had the right to "have an attorney present

14  before or during questioning" and asked whether he understood, Cook responded "yeah," and

15  proceeded to answer questions for the next approximately six hours (Exh. 340 at 6222; Exh.

16  453).[2]

17         From the outset of the interrogation, there were signs that Cook was either seriously

18  confused, or otherwise mentally incompetent.  Cook incorrectly stated his age and the year he

19  was born, and was unsure what day it was (*id.* at 6223).  He appeared distressed throughout the

20  interrogation, and repeatedly expressed his concern that if he told the police anything, it would

21  put his family in danger (*see* Exhs. 453 and 454).  He was often fed answers through leading

22  questions.  He also stated that he "must have" done things the officers state that he did, though

23  he could not actually remember having done them (Pet. at 101–110).

24         In the course of the interrogation Cook stated that he "blanked out" during both the

25  Bettancourt and Morris homicides, but admitted to having been on the scene of both, and with

26  respect to the Bettancourt homicide stated that he was holding the gun and "figured [he] did it"

27

28         [2]  The interrogation, which was tape recorded and later transcribed, concerned only the Bettancourt and
    Morris homicides.  A later separate interrogation concerning the Sadler homicide was unwarned and the
    prosecution agreed not to try to introduce it at trial.  *Cook,* 39 Cal. 4th at 590.

(Exh. 6476, 6479, 6512–13).  His statement regarding the Morris homicide was more equivocal.

He admitted to being in a car with Branner and Senegal when Morris approached, but said that

he just "blank[ed] out" when Morris got close (*id.* at 6366).  Cook admitted, however, that he

was the only one with a gun that night, and he did not recall either of the other occupants of the

vehicle using his gun (*id.* at 6366–6367, 6375, 6382–83).

Questioning ended at approximately 2:30 a.m. and Cook was returned to his cell.

The next afternoon, Cook was again brought into the interrogation room by Sergeant Eatmon

and Inspector Sabin.  This time when read his rights Cook asked, "when you all talk to me, I'm

supposed to have an attorney here or something?"  The officers clarified that he had the *right* to

have an attorney present.  This led to the following exchange (Exh. 340 at 6537–38):

> Cook:  Is that the only time you could have an attorney to be able, when you go to court?
>
> Inspector Sabin:  You can have an attorney present any time during these [] proceedings.
>
> Cook:  I didn't know that.
>
> Inspector Sabin:  Okay, well, do you remember me reading that off to you yesterday?
>
> Cook:  Not really, but I remember you was reading something about my rights.

At this juncture, Cook informed the officers that he would like to speak with his mother

and did not want to talk more until he had done so (*id.* at 6538–40).  Before ending the

interrogation, however, Inspector Sabin asked Cook a series of questions about what he

understood of his *Miranda* rights when he appeared to waive them the day before.  Cook again

explained that he "didn't know that . . . when you guys talked to me that I could have a lawyer

here" (*id.* at 6541).  Inspector Sabin continued to probe this issue, asking Cook whether, at the

time of any previous arrests (as a minor) he had been read and understood his rights (*id.* at

6541–42).  Again, Cook explained that "I didn't know . . . when [] people come to question you,

you can have a lawyer present with you" (*id.* at 6542).  The officers then ended the second

interview.

They brought Cook back to the interrogation room again at 6:20 p.m. that same day, after he had had an opportunity to speak to his mother. Inspector Sabin asked whether Cook wanted to talk to them, and Cook responded "No, [my mother] told me I should wait til I get back to California, we got to talk to my lawyer" (*id.* at 6543). After the officers clarified that Cook no longer want to talk, they ended the interview (*ibid.*).

### *(b)* *Cook's Psychological Evaluations.*

Subsequent to his interrogation, but before trial, Cook submitted to psychological evaluation. According to Dr. William Lynch, the neuropsychologist who evaluated Cook, his level of intelligence was "low average overall . . . with verbal and performance abilities falling at the extreme low end of the average range" (Exh. 449 at 8648). The tests further indicated that Cook suffered from a developmental learning disability involving reading and writing, and that he had a "narrow, precarious attention span that can be interrupted easily" and as a result "often fails to apprehend complete messages (words, phrases or numbers) due to problems with organizing the information correctly" (*id.* at 8647–48). The report concluded that Cook "is apt to have difficulty with understanding complex spoken and written speech" (*ibid.*). It also noted that he had not graduated high school or obtained a GED, and to the extent he attended high school received C's, D's and F's (*id.* at 8643).

In support of his state habeas petition, Cook underwent further psychological evaluation and presented declarations from three additional mental health experts. Doctor Myla Young, a clinical psychologist, evaluated Cook in 2004 over the course of three days. She submitted a declaration stating that Cook's overall mental function was "borderline to low average" and that he had a verbal IQ of 85, and a performance IQ of 82. Cook's performance on the test that predominantly measures his ability to process new information, however, showed an IQ of 78. Doctor Young opined that while individuals with this level of functioning "are often able to function adequately in environments that are reasonably predictable, stable and simple, they are not able to function adequately in situations that are even moderately complex." Complex situations can overwhelm such individuals and cause them to act erratically (Exh. 504 at ¶¶ 18–20). Doctor Young further declared that the tests she performed in 2004 did "not reflect

16

United States District Court

For the Northern District of California

evidence of a significant decline in [Cook's] functioning from 1992 to 2004" and that it was therefore "reasonable to conclude that the impairments [Cook] demonstrates in 2004 would have been present at the time of the offenses and his trial" (*id.* ¶ 35). Dr. Young compared the 2004 test to the test that Cook underwent in 1994 and determined that the results were "significantly similar" (*id.* ¶ 36).

Doctor George Woods, a psychiatrist, provided a psychodiagnostic assessment of Cook. His report recited Cook's traumatic childhood in detail, including many episodes of physical violence and neglect, as well as consistent exposure to alcohol, drugs and drug dealing in his home (Exh. 506, *e.g.,* ¶¶ 98-106, 125-167). It also discussed at length Cook's exposure to death and violence on the streets of East Palo Alto (*id.* ¶¶ 261–69).

Doctor Woods further observed that Cook engaged in depressive and aberrant behavior shortly after his arrest and interrogation. For instance, in jail, while awaiting trial, Cook stopped exercising or participating in any other activities, spending time curled up in bed with a blanket over him (*id.* ¶ 271). He had developed strange, psychotic ideas that he wrote about, among them that he "saw a little yellow man in the television," and thought that people at the jail were "putting something in [his] food" (*id.* ¶ 273). Cook had also written that he heard voices, which were trying to control him (*ibid.*).

Based on his traumatic childhood and the symptoms he manifested around the time of his arrest and interrogation, Dr. Woods concluded that Cook suffered from an organic brain disorder that caused him to dissociate and to fail to recall information and details (*id.* at 293–5). He opined that Cook "readily incorporates cues, prompting and direction form others" and is vulnerable to "suggestibility and confabulation" (*id.* ¶ 290). He further opined that Cook suffered from post traumatic stress disorder. These conditions, he concluded, in combination with Cook's borderline to low average intellectual functioning satisfied the diagnostic criteria for mental retardation (*id.* at 295).

Finally, Doctor Zakee Matthews, a clinical psychiatrist, reviewed the videotape of Cook's interrogation, and based upon his review gave the opinion that "it was extremely unlikely Mr. Cook could have meaningfully understood the admonition regarding his legal rights

17

as expressed in the language and manner used by the interrogating officers" (Exh. 520 at 9725).

Dr. Matthews observed Cook's apparent confusion at the outset of the interrogation as well as

his continuing inability to answer complex questions appropriately (*id.* at 9726). He concluded

that "based on signs of Mr. Cook's impaired cognition, distractibility, and dissociative

tendencies during clinical assessments, and similar signs appearing in the videotape, it is evident

that his limited abilities to attend to or comprehend minimally complex language were

overwhelmed during the commencement of the interview" (*id.* at 9726).[3]

### (c)    *Cook's Miranda Waiver Was Not Knowing And Intelligent.*

The above mental health evidence was all before the state habeas court, which, upon

consideration of Cook's petition, ordered the Director of the Department of Corrections to show

cause as to why Cook's death sentence should not be overturned based on his mental

deficiencies pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). The San Mateo Superior Court

found that Cook was mentally retarded within the meaning of *Atkins*, vacated Cook's death

sentence, and imposed a sentence of life without the possibility of parole (Ex. C7). Despite this

finding, the state habeas court summarily denied Cook's claim that he was entitled to habeas

relief on the grounds that he did not knowingly and intelligently waive his *Miranda* rights.

Respondent argues that the state habeas court's determination was reasonable, and that

Cook knowingly and intelligently waived his rights. Its argument, however, hinges entirely

upon Cook's pre-trial psychological evaluation, which Respondent contends showed that Cook

was capable of understanding and intelligently waiving his rights. Respondent observes that his

pre-trial evaluation showed that Cook scored in the low-average range of intelligence and only

had minor disabilities, mostly related to reading and writing (Dkt. No. 39 at 3–4). Respondent's

argument, however, ignores the report's conclusion that Cook had a "narrow, precarious

attention span that can be interrupted easily" and as a result "often fails to apprehend complete

messages (words, phrases or numbers) due to problems with organizing the information

---

[3] Dr. Matthews was originally scheduled to testify at Cook's trial in 1994, but the morning that he was to take the stand, his wife went into labor, and Dr. Lynch (whose report is discussed above) testified in his stead (*id.* at 9724). In his declaration, Dr. Matthews explains that he was prepared to render an opinion that Cook "suffered from mental disorders, including PTSD" that he was "clinically depressed and that he endorsed symptoms diagnostic of substance abuse" (*id.* at 9724).

1 correctly," and that he "is apt to have difficulty with understanding complex spoken and written

2 speech" (Exh. 449 at 8647–48).

3 Nor does Respondent grapple with any of the later evaluations, except to note that they

4 are "less relevant" because they took place a decade after the interrogation (Dkt. No. 39 at 4).

5 The medical professionals that performed these evaluations, however, endeavored to evaluate

6 Cook's mental condition at the time of his interrogation and trial. They did so by consulting the

7 videotape of his interrogation and other records created before trial as well as evaluating the type

8 of disability Cook suffered from, and whether their present evaluation was consistent with the

9 evaluation performed in 1994 (*see* Exhs. 520 at 9725; 506 ¶¶ 270–75; 504 ¶¶ 35). Based upon

10 these considerations, the declarants expressed an opinion that Cook suffered from disabilities at

11 the time he was interrogated, which prevented him from intelligently waiving his rights.

12 Respondent has not presented any evidence to contradict any of the expert opinions.

13 Finally, Respondent's answer ignores what is perhaps the most critical fact: Cook

14 repeatedly told his interrogators that he had not understood he had the right to have an attorney

15 at the interrogation. In short, Respondent's answer is not persuasive.

16 This order concludes that Cook's *Miranda* waiver was not knowing and intelligent.

17 Given substantial evidence of his inability to comprehend his rights, including his youth, low IQ,

18 psychological deficiencies, inability to follow verbal instructions, dissociation, and his

19 statements to interrogators that he did not understand he had the right to have a lawyer present at

20 his interrogation, a contrary conclusion is unreasonable. *See Taylor*, 366 F.3d at 1000.

21 Accordingly, this order turns to the question of whether Cook's waiver, when considered in the

22 whole context of his case "had a substantial and injurious effect or influence in determining the

23 jury's verdict." *Jackson v. Giurbino*, 364 F.3d 1002, 1010 (9th Cir. 2004) (quoting *Calderon v.*

24 *Coleman*, 525 U.S. 141, 147 (1998)). The reviewing federal habeas court must have "'grave

25 doubt about whether [the *Miranda* violation] had substantial and injurious effect or influence in

26 determining the jury's verdict'" to grant relief. *Mays v. Clark* , 807 F.3d 968, 980 (9th Cir.

27 2015) (quoting *Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015)).

28

### (2)    *Substantial and Injurious Effect?*

Respondent argues that even excising Cook's statements from the trial, there is no doubt that he would have been convicted of both the Bettancourt and Morris homicides due to the presence of other inculpating evidence (Ans. at 31–32).  The other evidence from each scene is analyzed in turn.

### (a)    *Bettancourt.*

A large group of individuals were present at the Bettancourt homicide, which took place on a street that was used as an open-air drug market, seven of whom gave statements to police indicating that Cook was the perpetrator (*see id.* at 32 citing RT 3474, 3484, 3492, 3579, 3692, 3698, 3742, 3751, 4029–32, 4035, 4041, 4508, 4552).  Many of the statements, however, were in some way compromised, either because the officer who took the witness's statement allegedly provided the witness with details of the crime through leading questions, and/or threatened that if the witness did not name Cook as the shooter, she would be charged as an accessory to the homicide (RT 3495–98, 3507-10, 3513 (Tomika Asburry recanting earlier taped statement and claiming she merely adopted Inspector Sabin's version of the events); RT 5316–18, 5326, 5688–90 (Teresa Beasley recanting taped statement saying police coerced her into naming Cook); RT 4431–55  (Darnell Earby recanting taped statement and saying he told police what they wanted to hear so they would stop bothering him);  RT 3724–26 (Shawnte Early recanting taped statement)).

Steven Sims also named Cook as the shooter and gave a detailed description of the crime.  His testimony, however, was also compromised because he was another suspect.  By his own admission, Sims was on the scene to make a crack sale, and was kneeling inside the victim's car (where he allegedly dropped a crack rock) moments before the shooting began (RT 4028–33).  Furthermore, ballistics evidence suggests that he may possibly have fired at least one gunshot (RT 5880–81).  Sims was ultimately granted leniency for his testimony against Cook (Exh. 465 at 8898–904).

There was, however, at least one untainted witness.  Nathan Gardner, who did not allege any impropriety in his police interview and was not otherwise directly connected with the crime,

testified that he was approximately twenty feet from Bettancourt's car and saw someone who he identified as Cook shoot Bettancourt. When he fled from the scene, Cook got into the backseat of his car and told Gardner to drop him off down the road (RT 4507–09, 4512). While Cook was in his car, Gardner testified that he asked Cook "What you do that for, what happened[?]" and Cook responded "I don't know . . . [Bettancourt] tried to gaffle [*i.e.* steal from] me" (*id*. at 4552–53).[4]

Moreover, even though many of the witness accounts are suspect because they were allegedly induced through leading questions or coerced, all witnesses gave a highly similar account of the events. Discounting Asburry and Beaseley's statements, which were allegedly elicited through leading questions, that leaves four witnesses, all of whom corroborate each others statements. In summary, each witness testified that Sims and Cook approached Bettancourt's vehicle to make a crack sale, that Sims opened the driver's side door and knelt down beside it, and that Cook then shouted at him to move and opened fire on Bettancourt. The volume of corroborating testimony coupled with Gardner's untainted account is strong evidence of guilt.

Ballistics evidence is likewise consistent with the witnesses testimony. Thirteen shell casing were found a short distance from the driver's side door of Bettancourt's vehicle (RT 3438–39). All thirteen were the same caliber, type, and brand of ammunition, eleven of which the criminologist was able to determine came from the same gun, two of which "were poorly marked, but appeared consistent with having come from the same gun" (*id.* at 3439).

Under these circumstances, it was not unreasonable for the state habeas court of find that the admission of Cook's confession did not actually prejudice Cook with respect to the Bettencourt homicide. *See Mays*, 807 F.3d at 980.

### *(b)* *Morris.*

The Morris homicide likewise presents a close case. Additional evidence was introduced against Cook; however, much of it was in some manner problematic. Two eyewitnesses who

---

[4]  Gardner was granted transactional immunity as a condition to testifying that he drove away with Cook in his car (to protect him from later prosecution as an accessory), though the rest of his testimony was not immunized (RT 4544–50).

testified that they saw Cook shoot Morris, Lavert Branner and Shannon Senegal, were in the car with Cook at the time of the shooting and were themselves suspects. Through their cooperation, they were granted leniency and were not pursued as murder suspects (*see* RT 4197, 4213–16 (Branner); RT 4583 (Senegal)). At trial, Branner admitted that he first came forward as a witness against Cook when he allegedly discovered that Cook was trying to pin the Morris homicide on him, and two of Branner's friends, Monique Barrett and Lakishain Smith, testified that Branner had told them on one occasion that *he*, not Cook, had killed Morris (*id.* at 4229, 4240–41; RT at 5442–44).

Senegal, who was driving the car, was also initially identified as a suspect. At trial, the defense relied upon a taped statement given by Tasha Bradford, a bystander, identifying Senegal as the man who she thought shot Morris, though in her live testimony she clarified that she had not seen the shooter and just assumed it was Senegal based upon his position in driver's seat of the car (RT 4831–32, 5955; *Cook*, 39 Cal. 4th at 581). Senegal was eventually charged as an accessory after the fact to the homicide, but was promised that his charges would be reduced to a misdemeanor if he testified, which they were (*id.* at 4610; Exh. 416–18).

Were these the only two witnesses, Cook's wrongfully admitted confession would possibly be prejudicial. A third eyewitness, however, who was merely a bystander, testified that she saw Cook shoot Morris, and her account corroborates the accounts given by Branner and Senegal (RT at 4746–4747). Sharoon Reed, who knew Cook from the neighborhood, happened to run into Cook, Branner, and Senegal in a liquor store the night of the Morris homicide (*id.* 4737–38). It so happened that Reed and two of her girlfriends were going to see Morris that night, so when Cook drove away from the liquor store in the direction of Morris' apartment, Reed followed. Reed testified that she saw Cook hold a gun out the window of the car and wave it around as they followed (she suspected to show off to the women) (*id.* 4739). When they arrived at Morris' apartment building, Morris, who was standing by the side of the road, flagged down Cook's car (*id.* at 4741). Cook's car pulled up next to Morris, and Reed's car stopped close behind it (*id.* at 4742–43). From that distance, Reed testified, she heard Morris,

who approached Cook's car, say "damn, you all strapped?" and immediately thereafter saw Cook lean across the driver's seat and open fire on Morris (*id.* at 4744–47).

Given this corroborated eyewitness account of the Morris homicide, it was not objectively unreasonable for the state habeas court to conclude that, on the basis of the testimony presented against Cook at trial, the erroneously admitted confession did not have an "injurious effect or influence in determining the jury's verdict." *See Coleman*, 525 U.S. at 148.

### *(3)     Voluntariness.*

Because the erroneous admission of a coerced confession is subject to the same harmless error analysis as failure to knowingly and intelligently waive *Miranda* rights, this order does not reach the voluntariness inquiry. *See Fulminante v. Arizona*, 499 U.S. 279, 306–12 (1991). Just as above, it was reasonable for the state habeas court to conclude that playing Cook's interrogation tape to the jury did not unreasonably prejudice him.

### B.     Investigative and Prosecutorial Misconduct.

Cook next alleges that the Palo Alto Police Department and the San Mateo County District Attorney's Office engaged in a pattern of prosecutorial misconduct that violated his constitutional rights. The California Supreme Court denied this claim on the merits but without explanation.

The standard of review for claims of prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Ibid.*

Cook contends that several errors and improprieties committed by the investigators and prosecutors, including falsifying reports and evidence, coercing statements from witnesses, and failing to disclose exculpatory and impeachment information, conspired to deprive him of due process. This order addresses each in turn, and then addresses the cumulative effect of any alleged prejudice.

### *(1) Corrupt Investigation.*

Cook contends that his case was investigated in a manner "consistent with the corrupt culture and practices of law enforcement in East Palo Alto and San Mateo County" (Petn. at 25). He identifies various incidents of East Palo Alto Police misconduct in the late 1980's and early 1990's purporting to demonstrate this culture, though these incidents have no relationship to Cook, and are instead drawn largely from media accounts of the state of affairs in East Palo Alto at that time (*id*. at 25-36). While such incidents have some bearing on the plausibility of allegations that Cook was subjected to unfair and corrupt treatment, they cannot, standing alone, be said to have infected *his* trial with unfairness, or rendered its result fundamentally unfair. The state court's determination that allegations of corruption in a police department, generally, was not grounds for habeas relief was a reasonable application of established federal law.

### *(2) Failure to Preserve.*

Cook further contends that the law enforcement agencies involved in the investigation and prosecution of his case "failed to collect, preserve, and/or disclose" certain evidence relating to the murders, which Cook's attorney could not "examine, test, or otherwise obtain" exculpatory results from (Petn. at 36–38).   He contends that this amounted to a violation under *Brady v. Maryland*,  373 U.S. 83 (1963), and constituted reversible error.

A *Brady* violation occurs when the prosecution fails to disclose material exculpatory evidence to the defense "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Exculpatory evidence is material if there is a "reasonable probability" that the result at trial would have been different had such evidence been disclosed. *Cone v. Bell*, 556 U.S. 449, 469–70 (2009).  The mere possibility that undisclosed information might have been helpful to the defense or might have affected the outcome of the trial, however, does not establish materiality under *Brady*. *United States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013).  The failure to preserve evidence which merely "might have exonerated the defendant" only rises to the level of a constitutional violation if the evidence was destroyed in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988); *see also California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

The state habeas court's determination that the physical evidence did not rise to the level of a *Brady* violation was reasonable. None of the evidence Cook points to has material exculpatory value. Rather, it falls into the speculative category of scenarios that only possibly affected the outcome of the trial. *See Youngblood*, 488 U.S. at 56. Because Cook has failed to show bad faith in connection with the failure to collect this evidence, the state habeas court's determination that no constitutional violation occurred was reasonable.

### *(a)* *Sadler Evidence.*

The most compelling evidence Cook describes in connection with the Sadler homicide consists of blood droplets observed near the murder scene, Sadler's shoeprints leading from the Menalto property to the street, and a wooden post similar to the one used to kill Sadler found inside of the Menalto Street house (Petn. at 37). The alleged failure to preserve this evidence, however, does not give rise to any constitutional violation.

The blood droplets observed near the murder scene could have had exculpatory value, but they could have as easily inculpated Cook if determined to belong to him, or had no value at all, if, for instance, the blood matched the victim. Accordingly, the blood droplets do not fall into the category of material exculpatory evidence required to show a *Brady* violation. Rather, they are the sort of "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. Since Cook has not shown that police acted in bad faith in failing to collect this evidence, it was reasonable for the state habeas court to find no constitutional violation. Nor does the presence of a wooden post "similar to the one used in the assault of Mr. Sadler" inside the Menalto house constitute *Brady* evidence. As an initial matter, the post was photographed, and the photograph was included in the investigatory case file, which was turned over in discovery (Exh. 515 at 9697). Moreover, the presence of a similar looking post in the Menalto house is at best tangential evidence that could have had some value to Cook, but could have as easily proved irrelevant. As above, the failure to actually collect the post and turn it over to the defense was not a constitutional error.

Like the wooden post, the defense was made aware of Sadler's shoeprints and, in fact, raised the matter before the jury in support of its theory that someone residing at the Menalto house had committed the murder (RT 3326). The prosecution did not contest that Sadler's footprints were found on the front lawn of the Menalto property. The mere fact that detectives did not take molds of the footprints has little or no bearing on the outcome of Cook's trial. Other evidence Cook describes at the Sadler murder scene that officers allegedly failed to collect consists mostly of detritus — *e.g.*, a discarded hat, a gin bottle, a metal crack pipe (Petn. at 37). These items *could have* been connected to Sadler's murder, but could just as well have been completely unconnected. Police do not have a constitutional duty to collect every item they find in proximity of a crime scene, irrespective of its apparent relevance. *Kyles*, 514 U.S. at 436–37.

Finally, Cook argues that the investigators committed a *Brady* violation by taping over an interview they conducted with a potential witness, Alphonse Grimes. Cook alleges that, in order to curry favor with police to obtain lenient treatment following his own arrest, Grimes "falsely informed the police he had allegedly seen Mr. Cook and [Shannon] Senegal running from the Sadler crime scene" (Petn. at 50). Subsequently, however, police were unable to corroborate Grimes' story and abandoned him as a witness (*id.* at 56). It is not clear how taping over the Alphonse Grimes interview, which inculpated Cook, could have prejudiced him, especially in light of the fact that the police deemed Grimes' story not credible and did not attempt to introduce his statements at trial or call him as a witness. The alleged destruction of this interview had little or no effect on Cook's trial or conviction.

The state habeas court's conclusion that the alleged failure to preserve evidence connected with the Sadler homicide did not violate Cook's constitutional rights was reasonable.

### (b)    Bettancourt and Morris Evidence.

The state habeas court also reasonably concluded that the failure to collect certain items of evidence at the Bettancourt and Morris scenes did not rise to the level of a constitutional violation. Like the Sadler items, Cook points to a large array that the government allegedly failed to preserve, including items found in Morris' pockets, such as shopping receipts, rolling papers and a plastic baggie of marijuana, as well as clothing and other sundry items in Morris'

car. For the same reasons as above, it was reasonable to conclude that the failure to collect these items did not violate Cook's constitutional rights.

Cook also describes other physical evidence which is more closely connected to the Morris homicide, and which investigators failed to preserve. Investigators did, however, preserve comparable evidence that the defense could have examined and tested, undercutting claims that this alleged failure to preserve prejudiced Cook. *See Trombetta*, 467 U.S. at 489 (government's duty to preserve evidence extends only to evidence of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means).

For example, investigators lost the shirt that Morris had been wearing at the time of the shooting before the defense could examine it. They did, however, preserve gunshot residue samples from Morris' shirt (the evidence that Cook argues could have been potentially exonerating), which the defense had an opportunity to independently test (Exh. 505 at 9525). Cook also alleges that investigators failed to take photographs of the placement of some of the bullet casings near the Morris vehicle. To the extent that this failure could have prejudiced Cook, any such prejudice was mitigated by the fact that the bullet casing and the bullets were collected and preserved. This evidence was examined by ballistics experts and presented at trial (*see* Exh. 370 at 6781).

Moreover, it is not reasonably probable that the evidence Cook points to would have changed the result at trial. The physical evidence is, instead, inconclusive, or only provides a remote chance that, had it been preserved, it would have altered the course of the trial. "[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles*, 514 U.S. at 436-37. It was not apparent that the items Cook describes were exculpatory. *See Trombetta*, 467 U.S. at 488–89. They could, just as likely, have inculpated Cook. This is the sort of evidence, which, at the very least, requires a showing that it was destroyed in bad faith in order to rise to the level of constitutional violation, and no such showing has been made. *See Youngblood*, 488 U.S. at 57–58.

### *(3)* *Falsifying Reports, Testimony, and Evidence.*

Cook next contends that law enforcement falsified or omitted key exculpatory information from official reports in order to deflect suspicion from third-party suspects and underscore Cook's suspiciousness (Petn. at 39–51).

Cook raises numerous alleged deficiencies and irregularities in law enforcement reports. The most notable is a set of field notes created by Detective Osborn, one of the lead detectives investigating Cook's case, which indicate that a confidential informant (later revealed to be Steven Sims) told Detective William Osborn that he had heard three others committed the Sadler homicide: Earnest Woodard, Thomas Young, and Edward Branner, Jr. (Petn. at 39; Exhs. 8501–02). This information was later omitted from Detective Osborn's official report, which, aside from this omission, reproduce his field notes almost verbatim (compare Exh. 428 at 8454–63 to *id.* at 8501–02).

Despite leaving this information out of his official report, however, his handwritten notes were produced to the defense in discovery along with the official typed report (RT 3970). Because the prosecution did not withhold this information, it cannot form the basis of a *Brady* violation. Moreover, the defense used this information to cross-examine Detective Osborn about the inconsistency between his field notes and report and in doing so was able to place this information in front of the jury, and to note that all three of the suspects named by the confidential informant were in the Menalto house at the time of the murder (*id.* at 3970–75). Accordingly, the inconsistency between Detective Osborn's official report and field notes did not prejudice Cook. *See Cone*, 556 U.S. at 469–70 (petitioner must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

Cook points to other alleged falsifications, which he argues entitle him to relief. Only one is of possible relevance here. A series of microscope photographs used in a side-by-side comparison of bullets from the Morris and Bettancourt autopsies contained an irregularity that could have been the result of evidence tampering. In the ballistics report, a case number is written next to each photograph, one on the right and one on the left, to denote which autopsy the

bullet was recovered from. The photographs on the right side of the comparison, allegedly from the Bettancourt autopsy, each have part of the case number crossed out, and a new number written in its place (*see* Exh. 370 at 6765–6778). Based upon this alteration, Cook concludes that the photographs ostensibly comparing bullets from the Morris autopsy to bullets from the Bettancourt autopsy may have actually both been from the Morris autopsy (Petn. at 40–41; *see* Exh. 505 at 9520–21).

It is not clear from viewing the alterations that this is the case. The numbers are somewhat obscured and this could as easily have been an innocent mistake, although it raises some suspicion that there is no note clarifying why the numbers were crossed out and re-written. Nevertheless, given the volume of other evidence supporting the jury's findings, this alleged labeling error does not render the state habeas court's conclusion unreasonable.

### (4) *Witness Tampering and Suborning Perjury*.

Cook further contends that the prosecution manipulated witness testimony and suborned perjury (Petn. at 45–56).

A conviction obtained by the knowing use of perjured testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prevail on a *Napue* claim Cook must show that "(1) the witness's testimony (or evidence) was actually false; (2) the prosecution knew or should have known of the falsity; and (3) the false testimony (or evidence) was material, *i.e.*, there is a reasonable likelihood that it affected the jury's decision." *Hein v. Sullivan*, 601 F.3d 907, 908 (9th Cir. 2010).

Cook's allegations of witness tampering, however, do not bear out. Cook argues, for instance, that an interview with Earnest Woodard, a resident of 2250 Menalto, shows that law enforcement used overbearing tactics to manipulate testimony (*id.* at 46). Woodard submitted a sworn declaration, which states that an officer "became extremely agitated" during a taped interrogation, turned off the tape and "rais[ed] his voice" and "c[ame] at [Woodard]" (Exh. 501 at 9448–49). The declaration, however, indicates that, at least initially, Woodard believed he and his housemates were being targeted in the investigation, and police were using these heavy-handed tactics to coerce Woodard into admitting his own guilt (*ibid.*). Later, the police "made it

29

clear" to Woodard that he either had to cooperate with the Sadler investigation, or they would continue to raid his house (*ibid.*). None of this shows that the prosecution or investigators forced him to testify in a particular way, nor was their decision to interview residents of the house in front of which Sadler was murdered unusual or unfair. *See Hein*, 601 F.3d at 908.

Cook also points to interviews in which Ella Thompson was allegedly coerced to testify against Cook and threatened that if she did not the police would take away her children (Petn. at 51–52; Exh. 499). Thompson, however, would not admit to seeing Cook at the scene of the Sadler murder, and did not testify at trial. Any alleged misconduct, therefore could not have resulted in prejudice to Cook.

Cook further argues that in many interviews police turned off the tape recorder and intimidated or coached witnesses (Petn. at 47). He does not point to evidence to support these claims; however, a review of the record shows that several witnesses claimed to have been coerced into making statement, by threats that they could be charged as accessories (*e.g.* RT 3513 (Tomika Asburry); RT 5315 (Teresa Beasley); RT 5078–79 (Earnest Woodard)). These witnesses, however, gave testimony at trial where they were given an opportunity to contest the officers' techniques (and did), and were subject to cross examination (*ibid.*; Petn. at 48). The jury had an opportunity to weigh their testimony and decide whether it was credible. Cook further characterizes law enforcement's seeking out and interviewing certain witnesses as harassment, but this can as easily be described as persistence in investigating a serious crime (*see* Petn. at 49–50).

In further support of his contention that the prosecution suborned perjury, Cook cites Shannon Senegal's testimony that, in order to receive his deal, he would "Tell them what they want to hear" (*id.*; RT 4669). This is misleading. Senegal's entire statement was as follows (*ibid.*):

> Q:    Now, what condition has there been that you testify?
>       What do you have to do?
>
> A:    What do I have to do?
>
> Q:    Yes.
>
> A:    Tell them what they want to hear.

Q:     Tell them what they want to hear, or tell them the truth?

A:     Tell them the truth.

To the extent that Senegal's initial answer cast doubt upon his credibility, it was in front of the jury. The answer standing alone does not show that he perjured himself, less so that the prosecution suborned perjury.

Finally, Cook points to the favorable treatment of several witnesses in exchange for their testimony. In exchange for the cooperation of Steven Sims, a percipient witness to the Bettancourt murder, the government requested that Sims be released early from a prison term, and not be placed in custody in connection with a parole violation (Petn. at 52; Exh. 465 at 8898–904). Nathan Gardner, Earnest Woodard, Velisha Sorooshian, Shannon Senegal, Sharoon Reed and others were similarly granted leniency in pending prosecutions (Petn. at 53). A grant of leniency, however, is a commonly used prosecutorial tool to induce individuals to come forward who otherwise might not. Reduced sentences or favorable plea bargains in exchange for testimony do not, in themselves, form the basis of a constitutional violation. *Lisenba v. People of State of California*, 314 U.S. 219, 227 (1941).[5]

The state court did not err in denying Cook the extraordinary relief he sought on this basis, nor did it unreasonably apply federal law in reaching its determination.

### (5)     *Other Trial Conduct.*

Cook also argues that the prosecution engaged in misconduct throughout the course of the trial (Petn. at 80–88).

Whether the prosecution is guilty of actionable misconduct is a two-part analysis, which asks first whether the prosecutors remarks were improper, and if so whether they infected the trial with unfairness such that it violated the defendant's due process rights. *Tan v. Runnells*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Darden*, 477 U.S. at 181. A habeas petitioner is

---

[5] Cook argues that the prosecution failed to disclose that Sims was given favorable treatment for his testimony, but this argument is clearly undermined by the trial record, in which Sims admits to having received a lighter sentence and other favorable treatment for having come forward (*see* RT 4052–4055; Exh. 465 at 8898–904).

entitled to relief if he can show that the misconduct resulted in "actual" prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Most, if not all of Cook's allegations fail to show that the prosecutor's conduct was improper. For example, he argues that the certain lines of questioning had been ruled irrelevant, and that the prosecution pursued them anyway (Petn. at 81). This overstates his case. On two occasions Cook points to, the prosecutor arguably strays into a line of questioning that the judge deemed irrelevant in a sidebar, but the questions do not produce any answers that were particularly damaging to Cook, nor did they draw any objections from defense counsel (*see* RT 5452–5457, 5534).

Cook also objects to comments made in the prosecution's opening and closing statements. Again, these statements were neither misconduct, nor prejudicial. For example, Cook objects that the prosecution raised an issue in its closing argument that had earlier been the subject of a motion for sanctions (Petn. at 81). The motion, however, was not granted, and the parties agreed that the evidence at issue in the motion was peripheral (RT 4952). The prosecution's reference to this evidence in closing was neither improper nor prejudicial.

Other prosecution statements Cook objects to include:

- The prosecution's comments in its opening statement that Sadler lay defenseless for "a good long time," which was allegedly unsupported by the evidence (RT 3321);

- Argument that "every single shot went into Mr. Bettancourt" (RT 3312);

- A statement that Cook and Anthony Allen (an ancillary witness) were "good friends" (RT 5853); and,

- The prosecution's statements in closing that Cook "admitted killing [Mr. Sadler]" (RT 5847).

These statements are at most slight embellishments, and are not demonstrably false or improper. They cannot form the basis of a prosecutorial misconduct claim.

Finally, accusations that the prosecution improperly characterized witnesses' testimony as truthful or not truthful in closing argument is not evidence of misconduct (*see* Petn. at 84–85). The jury was instructed that closing argument was just that, argument, and that the case was to be decided solely on the evidence (RT 5999). "Prosecutors must have reasonable latitude to

32

fashion closing argument, and thus can argue reasonable inferences based on the evidence." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

The state court's determination that the prosecutions conduct at trial did not give rise to a constitutional violation was not unreasonable.

### *(6)* *Cumulative Effect.*

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003).

The arguments raised by Cook, and analyzed above, for the most part do not state claims for prosecutorial misconduct. Those that even arguably show misconduct, however, were not prejudicial. The Bettancourt homicide was corroborated by many eyewitnesses, all of whom gave similar accounts of the events. This evidence was so overwhelming that the defense reasonably chose not to contest it, but instead to focus on the other two homicides. As discussed above, the Morris homicide was corroborated by three eyewitness accounts and ballistic evidence, which taken together overcome the effect of any other errors that Cook alleges occurred. Finally, Cook has failed to show that prosecutors engaged in misconduct that in any way altered the result of the jury's verdict on the Sadler homicide. As noted above, much of the evidence that Cook argues was not preserved, such as Sadler's shoeprints and the similar-looking board, was photographed, and the photographs were turned over to the defense. There is no reason to believe that the physical items, as opposed to the photographs, could have helped Cook's case. Moreover, the Sadler homicide, like the other two, relied upon live witness testimony, which was not the subject of error.

To the extent that there was any prosecutorial, or investigative misconduct in Cook's proceedings, it was reasonable for the state habeas court to conclude that it did not prejudice Cook.

### C. Ineffective Assistance of Counsel at Guilt Phase.

Cook alleges he was deprived of constitutionally effective counsel during the guilt phase of his trial (Petn. at 112-58). As described above, claims for ineffective assistance of counsel are

governed by the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing (1) that counsel's performance fell "outside the wide range of professionally competent assistance," and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." Review under *Strickland* is "highly deferential" and "doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). Rational tactical decisions of trial counsel are entitled to substantial deference, *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994), and will not give rise to an ineffective assistance claim simply because in retrospect better tactics are known to have been available, *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984).

Cook first argues that trial counsel's failure to adequately pursue suppression of his taped confession to the Bettancourt homicide fell outside the wide range of professionally competent assistance (Petn. at 111). Counsel's decision not to pursue suppression, however, was part of a tactical decision, which, under the circumstances, was not unreasonable.

Given the many witnesses to the Bettancourt murder, all of whom identified Cook as the shooter, counsel decided to concede guilt and focus their energies on contesting the other two homicides. As part of that strategy, it was reasonable to permit jurors to hear Cook's confession to the shooting because, as his attorney Charles Robinson stated in a declaration attached to Cook's state habeas petition, "there was intuitive appeal to the argument that it did not make sense for [Cook] to confess to one shooting, but not the other, if he in fact committed both offenses" (Exh. 503 at 9485). Attorney Robinson further noted that "Cook's emotional state depicted in the videotape constituted potential mitigating evidence, and would be helpful if the case proceeded to a penalty phase*" (ibid*.).

Moreover, the record shows that his attorneys' decision to withdraw the motion to suppress was made in response to the prosecution's commitment not to introduce a taped statement Cook gave in connection with the Sadler homicide (*ibid.*; RT 31–32). The *in limine* hearing at which this deal was reached is somewhat hard to follow; however, it appears that

34

Cook's counsel withdrew its motion as a concession to the prosecution's commitment not to introduce the Sadler statement .[6] This exchange would certainly have been reasonable in light of the fact that it assured the Sadler statement would not be introduced, whereas absent such a deal it is possible that both confessions could have been deemed admissible.

Cook further argues that trial counsel was incompetent for failing to hire a medical expert to challenge certain evidence at the Bettancourt scene (Petn. at 118–119). Specifically, Cook observes that Bettancourt was shot in the thigh at an angle not compatible with a shooter standing above him (Cook's position), but rather with a shooter kneeling beside him (the position that Steven Sims occupied at the time of the shooting). Not hiring an expert to develop this theory was a reasonable tactical decision, however. As noted above, substantial evidence showed that Cook shot Bettancourt. Multiple witnesses testified that Cook was the shooter, he confessed to the shooting (which confession counsel had tactical reasons not to suppress, and which, even if they had pursued their motion may not have been suppressed), and the entry angles of Bettancourt's other bullet wounds were consistent with Cook's position as described by eyewitnesses. Moreover, even without calling their own medical expert, trial counsel was able to argue that the bullet wound to Bettancourt's thigh was consistent with Sim's position based upon the evidence presented by the testimony of the prosecution's medical expert (*see* RT 5880–81). In light of these facts, trial counsel was reasonable in deciding not to expend resources hiring a medical expert.

Cook further argues that trial counsel failed to adequately pursue a theory that either Tommy Young, Earnest Woodard, or Edward Branner were the real perpetrators of the Sadler murder (Petn. at 116). This is a mischaracterization of what actually occurred. Cook's counsel

---

[6] At an *in limine* hearing, Attorney Robinson stated as follows: "I want to inform the Court about one more item. The longest portion of the *Miranda* voluntariness issue, Mr. Foiles, [the district attorney], would be dealing with the last of the statements taken from my client. Mr. Foiles informed me this morning that they would not be contesting that portion of it. They would not. So Mr. Pomeroy [co defense counsel] and I are now discussing if the court — whether we even will go after the two other statements. So that whole motion would be moot at this time" (RT 31). The district attorney then clarifies that he will not seek to introduce the Sadler statement (*id* at 32). The motion to suppress the Bettancourt and Morris interview, which Attorney Robinson declared moot was not raised thereafter.

raised this theory throughout trial, and made it one of their central themes. They repeatedly argued that the Sadler investigation had narrowly focused on Cook because of his involvement in the other murders, and unreasonably overlooked the real perpetrators, who they argued were residents of the Menalto property, and most likely Young, Woodard, and Branner (*see*, *e.g.,* RT 3973, 3795–98, 3956, 5345–47, 5955, 5960–64).

Nor was counsel's choice not to present the alternate theory that *if* Cook had committed the Sadler killing, he would have been too intoxicated to have the requisite *mens rea* for first-degree murder prejudicial error (*see* Petn. at 116). Though counsel was permitted to put forth such a theory, it was a reasonable tactical choice to decide to pursue a complete defense, as trial counsel chose to do, rather than a diminished-capacity defense. *See Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2004) ("Having reasonably selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental-state defense"); *Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998) (no ineffective assistance for failing to present diminished-capacity defense where it would have conflicted with alibi defense presented at trial). Additionally, the available evidence does not bear out a theory that Cook was too intoxicated to have committed the homicide, consisting solely of one witness, Leonard Holt's, statement that at some unidentified time in the evening he encountered Cook who was "slurring his words and could barely stand" (Exh. 353 at 6646). Sadler's murder did not occur until early the next morning, and moreover, Holt's statement puts Cook at the scene of the murder on the night of the murder. It would have been reasonable for counsel to decided that this could do more harm than good.

Many of the other allegations upon which Cook predicates his ineffective assistance of counsel claims are addressed above, and need not be repeated here. These include claims that counsel should have contested the general practices of the East Palo Alto Police Department (Petn. 114–16), as well as various alleged acts of prosecutorial misconduct in Cook's investigation and at trial (*ibid.*).

Cook also argues that trial counsel failed to investigate various leads, or develop certain alternate theories (Petn. at 113–117). Counsel, however, need only "make reasonable investigations or [] make a reasonable decision that makes particular investigations unnecessary." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). Cook's counsel did so here. Cook's counsel developed a theme based upon its review of the evidence, and took reasonable steps to advocate for their client, including by hiring a defense investigator, conducting interviews of numerous witnesses and potential suspects, securing mental health professionals to testify as to Cook's diminished capacity, reviewing voluminous discovery, reviewing the backgrounds and records of witnesses to prepare for cross-examination, and seeking to exclude potentially prejudicial evidence through motion practice.

Cook attempts to impose a standard of competency that would require counsel to pursue every possible theory that could potentially exonerate their client. The standard Cook urges would place an untenable burden on attorneys, and is quite simply not the law.

It was reasonable for the state habeas court to conclude that Cook's trial counsel did not provide constitutionally unacceptable representation.

### D. Trial Counsel's Conflicts-of-Interest.

Cook further alleges that trial counsel had impermissible conflicts of interest that prejudiced him (Petn. 158–172).

Criminal defendants have the right, under the Sixth Amendment, to representation free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). This right is violated if an attorney has an actual conflict and the conflict "adversely affected" his performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). An adverse effect in the *Cuyler* sense "must be one that significantly worsens counsel's representation of the client before the court or in negotiations with the government." *United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995). A petitioner must prove an actual conflict through a factual showing in the record. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), opinion amended on denial of reh'g, 253 F.3d 1150 (9th Cir. 2001).

Cook was appointed two defense attorneys through San Mateo's Private Defender Program, Charles M. Robinson and Edward Pomeroy, who represented him through the entirety of pre-trial and trial proceedings (*see* Exhs. 503 at ¶ 2; 509 at ¶ 1). These attorneys, Cook contends, had several conflicts which prejudiced his case, including that they had excessively large caseloads, which prevented them from devoting adequate time to Cook's defense, and that they had previously represented individuals who were prospective witnesses or suspects in the homicides that Cook was accused of committing (Petn. at 158-72). This order addresses each in turn.

### (1)     *Excessive Caseloads Allegations.*

Cook first argues that his attorneys were so over-extended that they were unable to adequately investigate his case or prepare an acceptable defense (Petn. at 159–160). In the first instance, Cook points to no authority, nor does any appear to exist that an excessively large caseload can be the predicate for a conflict-of-interest claim. Even assuming it could be, Cook does not point to specific deficiencies arising from his attorneys' caseloads. Instead he generally notes that both of his appointed attorneys undertook a large number of representation around the time of his trial, and prepared for other trials at the same time they were preparing for Cook's. These general allegations that his attorneys were overworked are not enough to show that Cook was denied his constitutional right to conflict free counsel. It was not unreasonable for the state habeas court to deny this claim.

### (2)     *Conflicting Clients Allegations.*

Cook further argues that Attorney Robinson, in his capacity as an appointed private defender, previously had represented several of the witnesses that were called against Cook, which allegedly resulted in a prejudicial conflict of interest. For the reasons below, these past representations did not create an actual conflict of interest, and Cook has not shown that they prejudiced his case.

Cook first argues that Attorney Robinson's past representation of Steven Sims, a witness who testified against Cook, created an actual and prejudicial conflict of interest. The record does not bear this out.

Attorney Robinson represented Sims in an unrelated felony case six years prior to the start of Cook's trial (RT 5/11/93 at 5–7). Accordingly, Attorney Robinson sought and obtained a waiver from both Cook and Sims, and disclosed the potential conflict and the waiver to the trial court (*ibid.*). To further protect Cook, however, Attorney Pomeroy, who had no history with Sims, performed all of the cross-examination of Sims at trial. The record shows that his cross-examinations were vigorous and in no way betrayed any conflict (*see, e.g.*, RT 4020, 4055, 4066–72, 4093). Though Cook now argues that his attorneys could have further investigated and impeached Sims, pointing to additional past crimes that Pomeroy could have cross-examined him about (Petn. at 163–66), this hindsight analysis does not show that Attorney Pomeroy failed, as a result of conflict, to adequately represent Cook's interests. Moreover, defense counsel is not required to cross-examine a witness about every point that could raise an issue of credibility so long as it raises sufficient credibility issues before the jury, as Attorney Pomeroy did here. *See Matylinsky v. Budge*, 577 F.3d 1083, 1093 (9th Cir. 2009).

Cook next points to several other witnesses that Attorney Robinson had previously represented, but as with Sims, Cook has not shown that these past representations resulted in an actual conflict that adversely affected his attorneys' performances. For example, Attorney Robinson represented Nathan Gardner in a drunk driving case two years before Cook's trial. Gardner claimed to have witnessed the Bettancourt homicide and testified at Cook's trial. As with Sims, Attorney Pomeroy, not Attorney Robinson, cross-examined Gardner, and was able to elicit testimony that impeached Gardner and showed that he was an unreliable witness (*see* RT 4523–32). As with Sims, Attorney Pomeroy's cross-examination failed to impeach Gardner with every possible piece of impeachment evidence Attorney Pomeroy had at his disposal, but there is no showing that this had anything to do with a conflict of interest, or that the additional the

additional impeachment evidence would have made a difference in the outcome of Cook's case (*see* Petn. at 169–70).

Attorney Robinson had also represented Earnest Woodard, who testified against Cook regarding the Sadler homicide, at an arraignment on a theft charge ten years before the start of Cook's trial, though it appears that he was merely standing in for a colleague (Exh. 297 at 5704). Cook has failed to show how this past representation in any way influenced the quality of Robinson's representation at trial.

It was not unreasonable for the state habeas court to conclude that Cook failed to show that these representations created actual conflicts that adversely affected his attorneys' performances.

### E. Competence to Stand Trial.

Cook contends the trial court failed to conduct an appropriate inquiry into his competence to stand trial (Petn. at 172–78). The California Supreme Court summarily rejected this claim on the merits.

Cook had "a due process right not to be tried while incompetent." *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). The test for competence is whether the defendant demonstrates the ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). This standard requires a defendant to have "the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001). This requires only minimal competency, and as the Supreme Court has observed, "Mentally retarded persons frequently . . . are competent to stand trial." *Atkins*, 536 U.S. at 305; *see also Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006), vacated in part on other grounds, 552 U.S. 117 (2008).

A trial judge is required to *sua sponte* order a competency hearing if he has a good faith doubt as to the defendant's competence. *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010)

(quoting *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir.1976) (en banc)). Several factors are relevant to this determination, including evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial. *Drope*, 420 U.S. at 180. "In reviewing whether a state trial judge should have conducted a competency hearing, we may consider only the evidence that was before the trial judge." *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008). Habeas relief is appropriate if the state court's decision not to conduct a hearing was objectively unreasonable. *Maxwell v. Roe*, 606 F.3d 561, 567–68 (9th Cir. 2010).

Here, it was not unreasonable for the trial judge to have foregone a competency hearing. True, there was some evidence that Cook suffered from mental deficiencies at the time of trial. Dr. Lynch's psychological evaluation showed that defendant fell in the low-average range of intelligence, had a poor attention span, was easily distracted, and had trouble following complex language (Exh. 449 at 8646–47). Additionally, Dr. Lynch testified at the penalty phase that Cook had a dissociative disorder that cause him to experiences lapses in memory and to "blank out" as well as suffering from PTSD (RT at 6667, 6704). Moreover, in the videotape of Cook's confession, he appears to be confused and distressed, and toward the end of his interrogation he breaks down in tears and cannot regain his composure (*see* Exh. 454; *e.g.* 340 at 6223–26). At times, he was flooded with emotion, and free-associated about traumatic experiences of his childhood (Exh. 506 at 9624).

Nevertheless, given the low standard for competency to stand trial, a reasonable trial judge could have concluded that Cook was competent. Indeed, he sat calmly and took notes during trial and did not exhibit any aberrant behavior in the courtroom (*see* RT 32; Exh. 491 at 9350). Despite his low-level functioning, it was not unreasonable to believe that he was able "to consult with his lawyer with a reasonable degree of rational understanding" and understand the proceedings against him. *See Godinez*, 509 U.S. at 396. The state habeas court's decision was therefore not unreasonable.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.      No Ineffective Assistance of Appellate Counsel.**

Cook next contends he received ineffective assistance of counsel on appeal (Petn. at 178–81).  As with Cook's ineffective trial counsel claim, this claim is governed by the two-prong test under *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000).  Appellate counsel is not ineffective when he fails to raise some but not all arguable issues on appeal.  The elimination of weaker claims and focus on those most likely to prevail is the "hallmark of effective appellate advocacy."  *Burger v. Kemp*, 483 U.S. 776, 784 (1987);  *Smith v. Murray*, 477 U.S. 527, 536 (1986) ("This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy").

Cook has failed to show that his appellate counsel's representation was so deficient as to fall outside of the wide range of professionally acceptable conduct, and moreover has failed to show that any of the alleged errors prejudiced him.  The record, instead, indicates that Cook's appellate counsel competently raised the most compelling and potentially viable claims.

Cook's allegations here grasp at theories that have little significance with respect to his conviction.  A good representative example is Cook's argument that failure to challenge the admission of photographs taken at the Menalto residence two days after the Sadler murder, as opposed to photographs taken on the same day as the murder, amounted to reversible error (*see* Petn. at 179; RT 5700).  Even if improperly admitted, it is clear that these photographs had little value or effect on the trial.  So too appellate counsel's failure to challenge the exclusion of evidence of witness Sims' repeated failures to appear in court.  Apparently, Cook's trial counsel wanted to use this fact to impeach Sims (RT at 4061–62).  It was, however, able to impeach Sims with evidence of numerous drug and robbery convictions (RT 4020, 4093, 4055).  Evidence of several missed court dates was simply not material and would not have strengthened Cook's case.

Cook raises a slew of other collateral issues that he claims his appellate attorney should have argued.  None of them would have in any way changed the result of his direct appeal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

They were, instead, issues better left out of an appeal in order to focus on those points that were arguably material. None of the alleged errors Cook points to state viable ineffective assistance claims, and therefore it was reasonable for the state habeas court to deny this claim.

### G. Cumulative Effect.

Cook contends that even if he errors alleged above failed to support any standalone claim, their cumulative effect constituted prejudice. In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See United States v. Green*, 648 F.2d 587 (9th Cir.1981). Here, there is substantial evidence upon which the finding of guilt is predicated, and few errors. With the exception of Cook's erroneously admitted confession, the prejudicial value of any other errors is low. Even when the errors are aggregated it cannot be said that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). It was reasonable for the state habeas court to conclude that there was no prejudice even taking into account the cumulative effect of all trial errors.

### CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus, and petitioner's request for and evidentiary hearing are **DENIED**. Petitioner has, however, made a substantial showing that a reasonable jurist could find this court's denial of his claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability is **GRANTED**.

43

The Court recognizes the superb work of pro bono counsel for Cook, namely the law firm of Jones Day, and particularly lawyers Caroline Mitchell, Gary Sowards, Kelsey Israel-Trummel, Paul Hines, and Sarah Pomeroy.  Their contribution to our system of justice in most appreciated.

**IT IS SO ORDERED.**

Dated: September 30, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE